[Civ. No. 52051. Second Dist., Div. Two. May 4, 1978.]

In re the Marriage of JUNE H. and ARNOLD LEIB.
JUNE H. LEIB, Respondent, v.
ARNOLD LEIB, Appellant.

**COUNSEL**

Harold Drooz for Appellant.

Jules S. Rensen for Respondent.

OPINION

ROTH, P. J.—On February 25, 1975, June Leib (respondent) after an approximate 15-year marriage, pursuant to her petition, received a dissolution judgment of her marriage to Arnold Leib. By the terms thereof, June was awarded custody of Paul, born in 1962; $250 per month plus extras for his support; her one-half of the community property; $500 per month spousal support until her remarriage, the death of herself or Arnold or the further order of the court.

Prior to the entry of the judgment of dissolution, June and Paul commenced to reside and live with Leonard Elbaum as a family unit and did continuously reside and live as a unit to and through March 10, 1977, the date of the hearing on the order which is the subject of this appeal.

June and Leonard cohabited, and in domestic, social and other respects lived as man and wife except that during the period of the relationship they shared expenses as detailed *infra* and did not at any time hold themselves out as husband and wife. To the contrary, each maintained separate names, bank and all other accounts, managed severally their separate properties, and in all social and other contacts maintained separate legal identities.

On August 11, 1976, Arnold initiated a motion based on Civil Code section 4801.5 as it then existed demanding June to show cause why the portion of the dissolution judgment requiring him to pay spousal support to her should not be revoked. That statute then provided:

"Upon the petition of a spouse who has been ordered to pay support under Section 4801, the court shall revoke the order for support upon proof that the spouse to whom support has been ordered to be paid is living with a person of the opposite sex and holding himself or herself out as the spouse of the person for a total of 30 days or more, either consecutive or nonconsecutive, although not married to the person. The court shall order the restitution of any support which has been paid since the date upon which the spouse to whom support has been ordered to be paid commenced holding himself or herself out as the spouse of the person."

Arnold's motion was denied. The trial judge held: ". . . neither . . . [June] or [Leonard] . . . have [*sic*] been holding themselves out as husband and wife or as spouses . . . ."[1]

On February 24, 1977, Arnold filed a motion for the same relief based on the same numbered section as it had been amended in 1976, effective January 1, 1977. The amended section 4801.5 reads as follows:

"(a) Except as otherwise agreed to by the parties in writing, there shall be a rebuttable presumption, affecting the burden of proof, of decreased need for support if the supported party is cohabiting with a person of the opposite sex. Upon such a finding of changed circumstances, the court may modify the payment of support as provided for in subdivision (a) of Section 4801.

"(b) Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this section.

"(c) Nothing in this section shall preclude later modification of support upon proof of change of circumstances."

On March 10, 1977, after a hearing of the February motion, the trial court made a minute order denying Arnold relief. Arnold's appeal herein is from this order. He asserts the decision of the trial court was clearly erroneous in that the undisputed facts provided insubstantial evidence as a matter of law to justify a holding that the presumption of decreased need under section 4801.5 was overcome by respondent. Alternatively, he claims the undisputed facts show that he has shown by a preponderance of the evidence no need for continued spousal support. No findings were requested by either party as permitted by Civil Code section 4801 and none were made.[2]

---

[1]Arnold filed another motion based on the same code section on December 8, 1976, and affidavits pro and con were filed with respect thereto. The hearing on the motion, however, was aborted.

[2]Upon conclusion of oral argument, the trial judge said:

"The matter having been submitted, the Court determines as follows:

"First pursuant to the stipulation that the petitioner is a person who resides with another person of the opposite sex, actually the word is, 'cohabitates,' with a person of the opposite sex. The Court feels after listening to the evidence that the petitioner has rebutted the presumption of decreased need for support as required by Section 4801.5 of the Civil Code.

"The Court denies the motion to modify spousal support."

It is apparent that the current section 4801.5 is markedly different from the section as it read before it was amended. Because section 4801.5 has not heretofore been interpreted by any appellate court of this state, we feel it necessary to discuss what appears to be its primary purpose and its significance in relation to former section 4801.5 and recent cases in related areas of family law.

■ Presently, a former spouse seeking relief from an order requiring the payment of spousal support to an ex-spouse who has a relationship with someone of the opposite sex must declare *only* that such relationship includes cohabitation to initiate the proceeding. If cohabitation is found to exist, the rebuttable presumption of decreased need for spousal support must be overcome by the supported spouse. No holding out as husband and wife is required for 30 or any number of days.

To properly construe the amended section 4801.5 in its application to what must be proved by the contesting parties, it is necessary to note what appears to be legislative declaration of state policy that cohabitation by a supported spouse with a person of the opposite sex is not in and of itself sufficient to *revoke* or *reduce* spousal support. In brief, if the presumption of decreased need is overcome, *two* divorced spouses of the opposite sex each receiving support by way of a prior dissolution from their respective divorced spouses may cohabit publicly or otherwise (and the statute does not limit the length of time) and continue to receive spousal support in whole or in part conditioned only on proof of continuing need.

We digress briefly to discuss the law under section 4801.5 before it was amended.

We construed it in *Lang v. Superior Court* (1975) 53 Cal.App.3d 852 [126 Cal.Rptr. 122].

The parties in *Lang* were not formally married and there was no proof or attempted proof of cohabitation, but each of the three elements statutorily required by section 4801.5 prior to January 1, 1977, to wit: (1) living together, (2) holding themselves out as married, and (3) that (1) and (2) existed for at least 30 days had been proved. The result in *Lang* impelled by section 4801.5 before its amendment was harsh.[3] Similar

---

[3]The statutory construction of section 4801.5 as it existed in 1974 when this court decided *Lang* was fortified by *In re Marriage of Ludwig* (1976) 58 Cal.App.3d 744 [130 Cal.Rptr. 234] and also by construction of a similar statute by the Court of Appeal in New York (Cf. the recent case of *Northrup v. Northrup* (1978) 43 N.Y.2d 566 [402 N.Y.S.2d

consequences to a divorced spouse receiving support are now avoided by the Legislature's pronouncement in section 4801.5.

At bench, cohabitation is admitted. Respondent contends, and the trial court held, although there is no formal finding, respondent had overcome the presumption.

We disagree.

Before we discuss and analyze the facts, it seems necessary to reiterate what should now enjoy common understanding; namely, that the evolution of the law in the area of domestic relations has been toward eliminating litigation of fault within or outside marriage between the contending parties so as to relieve courts of the burden of determining questions generated by charges of one against the other of irresponsibility, immorality and/or other conduct of omission or commission within the ambit of domestic disputes. The policy of the law as we understand it is to avoid those thorny and oftentimes disagreeable considerations in favor of a more pragmatic solution whereby substantial objective justice may be rendered between contending parties, irrespective of the fault of either. ▮ Such realistic procedure focuses attention not upon actions as culpable or innocent, but upon how those actions should be treated in reaching fair and equitable results to society in general as well as between the litigating parties.[4]

---

997, 373 N.E.2d 1221] which deals with earlier New York cases similar to *Lang*. There, situations such as the one in *Lang* and the one at bench are still governed by section 248 of the Domestic Relations Law of New York. That section is similar to California's section 4801.5 as it was prior to January 1, 1977.

[4]Alimony was unknown to the common law though it was not unfamiliar in ecclesiastical courts. In this country, it became a typical adjunct of divorce, created by statute and accepted generally as an award to a wife from a husband as a substitute for marital support lost through the husband's fault. (*Miller* v. *Superior Court* (1937) 9 Cal.2d 733 [72 P.2d 868]; *Mueller* v. *Mueller* (1955) 44 Cal.2d 527 [282 P.2d 869]; *Hall* v. *Superior Court* (1955) 45 Cal.2d 377 [289 P.2d 431]; *Estate of Fawcett* (1965) 232 Cal.App.2d 770 [43 Cal.Rptr. 160]; *Brawman* v. *Brawman* (1962) 199 Cal.App.2d 876 [19 Cal.Rptr. 106]; *Cardew* v. *Cardew* (1961) 192 Cal.App.2d 502 [13 Cal.Rptr. 620]), though that definition was often softened to avoid its abrasive characteristics. (*Newman* v. *Newman* (1969) 268 Cal.App.2d 895 [74 Cal.Rptr. 444].)

The Family Law Act (Stats. 1969, ch. 1608, operative January 1, 1970) makes no use of the term, speaks only of support or, perhaps by way of partial misnomer, spousal support, and eliminates reference to the notion of fault as a factor to be considered in effecting economic justice between parties upon dissolution of marriage.

"Under the preexisting law an award of spousal support rested in the judicial discretion of the trial court upon consideration of the circumstances of the parties, but one of the circumstances to be considered was the comparative marital fault of the parties. (See

The new statute fortifies this conclusion. In addition to the distinctions already mentioned between the new section 4801.5 and the old, there are other significant distinctions.

The old statute:

(1) upon proof of its requirements mandates ". . . the court *shall* revoke the order . . ." (italics added) and provides for restitution of money paid;

(2) makes no alternate provision for a decrease instead of revocation;

(3) makes no provision for "later modification . . . upon proof of change of circumstances."

The above factors suggest that the Legislature's intent in its enactment of the current section 4801.5 was to treat those to whom the section

---

former Civ. Code, § 139; *Nunes* v. *Nunes,* 62 Cal.2d 33, 38 [41 Cal.Rptr. 5, 396 P.2d 37].) There was involved 'a concept of granting support to the "innocent" or against the "guilty." ' (Attorney's Guide to Family Law Act Practice (Cont.Ed.Bar 1970) p. 139, § 3.3; see *Arnold* v. *Arnold,* 76 Cal.App.2d 877, 885-886 [174 P.2d 674]; *Webber* v. *Webber,* 33 Cal.2d 153, 157-158 [199 P.2d 934].) Under The Family Law Act the matter of spousal support is still addressed to the judicial discretion of the trial court upon a consideration of 'the circumstances of the respective parties, including the duration of the marriage, and the ability of the supported spouse to engage in gainful employment without interfering with the interests of the children of the parties in the custody of such spouse.' (Civ. Code, § 4801, subd. (a).) However, the specific circumstances now mentioned in the statute (the duration of the marriage and the ability of the supported spouse to engage in gainful employment) have long been among the circumstances considered by the courts in making awards of spousal support. (See The California Family Lawyer (Cont.Ed.Bar 1963) § 28.23, pp. 1333-1336 and cases cited; Attorney's Guide to Family Law Act Practice (Cont.Ed.Bar 1970) *supra.*) Thus, the change effected by Civil Code, section 4801 was the elimination of the consideration of the comparative marital fault of the parties and the 'concept of granting support to the "innocent" or against the "guilty." ' (See Attorney's Guide to Family Law Act Practice (Cont.Ed.Bar 1970) *supra,* § 3.3, pp. 139-140.) In determining the need for, the amount of and the duration of spousal support under The Family Law Act the court is to ignore marital fault and is to base its determination solely on the circumstances of the parties, including the duration of their marriage and the ability of the supported spouse to engage in gainful employment. (Civ. Code, § 4801, subd. (a).) ' "Circumstances" includes "practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties" [Citation omitted.] "[I]t refers to the needs of the parties and the abilities of the parties to meet such needs; and in measuring such circumstances, consideration should be given to property owned and obligations to be met as well as ability to earn and actual earnings." [Citation omitted.]' (*Hall* v. *Hall,* 42 Cal.2d 435, 442 [267 P.2d 249]; see also the enumeration of factors to be considered set forth in The California Family Lawyer (Cont.Ed.Bar 1963) *supra.*)" (*In re Marriage of Rosan* (1972) 24 Cal.App.3d 885; 892-893 [101 Cal.Rptr. 295].)

applies without penalty. The omission in section 4801.5 to fix duration of cohabitation may, too, be the reason for subdivision (c) which allows the court to deal with the parties upon the basis of circumstances as they exist from time to time on occasion when either party makes an application for relief. In many, though not all, instances, fairness and equity in this respect depend solely upon economic considerations. Such is the case here. We need not consider nor pass upon the morality of the relationship between June and Leonard nor upon their intent or the lack of it to evade section 4801.5 to examine whether under that section June or Arnold is entitled to prevail. ■ What is pertinent is a thorough and meaningful consideration of those factors enumerated in section 4801[5] and their proper relation to the question of diminished need under section 4801.5.

It is not enough under such analysis to balance income against expenditures to show need or its diminution.[6] On the contrary, to do so improperly restricts the meaning of the word "need" in section 4801.5. What a former spouse receiving spousal support "needs" under the statute is made up of a variety of factors viewed within the totality of particular and changing circumstances.

## DISCUSSION OF THE FACTS

June and her son Paul now live with Leonard in a home purchased by Leonard in 1976. June has, since the divorce, paid her living expenses and those of Paul and has had for some time past and currently still has

---

[5]In pertinent part, section 4801 provides:

"(a) In any judgment decreeing the dissolution of a marriage or a legal separation of the parties, the court may order a party to pay for the support of the other party any amount, and for such period of time, as the court may deem just and reasonable. In making the award, the court shall consider the following circumstances of the respective parties:

"(1) The earning capacity and needs of each spouse.

"(2) The obligations and assets, including the separate property, of each.

"(3) The duration of the marriage.

"(4) The ability of the supported spouse to engage in gainful employment without interfering with the interests of dependent children in the custody of the spouse.

"(5) The time required for the supported spouse to acquire appropriate education, training, and employment.

"(6) The age and health of the parties.

"(7) The standard of living of the parties.

"(8) Any other factors which it deems just and equitable."

[6]It is clear as pointed out (*infra*) June's standard of living, which is relevant but not controlling, is not determined solely by her income and expenditures but by a variety of factors which include in addition, her continued relationship with another who could provide her with more than she has or could hope for without the relationship.

approximately $1140 total monthly expenses against her total monthly income of $859, made up of $750 received from Arnold in child and spousal support and $109 from interest on savings and dividends on stock. Major items of expense testified to by June comprise: $325 per month for food for herself and Paul; $300 per month rental for herself and Paul which she pays to Leonard; and $515 for necessary household and living expenses for herself and Paul covering laundry, clothing, insurance, dental, entertainment, installment payments and other incidental living costs. June testified she drives a 1969 Ferrari automobile provided by Leonard at no expense to her except for gasoline; she, Leonard and Paul, among other trips, went on a six-week trip to Europe in 1976 for which she paid a portion of Paul's expenses with Leonard paying all other costs; she has stock of the value of $4,000 and two savings accounts—one of $18,000 and another of "$37,000 something,"[7] all of which were included with other substantial items of property in the dissolution judgment as her share of the community property.

June also testified that the sum of $325 spent by her monthly for food and household supplies was only a part of the total spent by her and Leonard for that purpose but that she did not know how much Leonard spent for similar supplies,[8] but she said Leonard paid the expenses of the new home and his personal living expenses.

Leonard, an automobile lease salesman, testified that: he acquired the new house in 1976 at a cost of $90,900; his annual income was and is $30,000; loan payments on the new house were $572 a month, with taxes and utilities approximately $300 and $140 per month, respectively, and monthly maintenance, $100. Insurance on June's Ferrari totaled $1,340 per year with a cost of maintenance in 1976 of "close to $4,000;" he owned two Ferraris other than the one used by June; his expenses for food and "if you want to call it entertainment, eating out, would run somewhere in the neighborhood of four to $500 a month." In pertinent part, Leonard also testified:

---

[7] This sum is maintained in respondent's name in a four-year account. No allowance was made for any interest earnings accruing to respondent's benefit since, according to her testimony, "that can't be touched."

[8] Respondent's lack of knowledge about such matters was considerable. She did not know the purchase price of the house in which she lives, nor how much Leonard put down against its cost, nor what were the mortgage payments, nor the monthly utility expenses. She did not know how much she received in cash from her settlement with appellant. She did not know how much Leonard paid for her portion of the 1976 European trip. She did not know what Leonard spent for insurance on her Ferrari, nor for repairs and maintenance respecting it nor did she know its value.

[By Appellant's Counsel:]

"Q. Do you receive any money from Mrs. Leib in connection with the payment of the mortgage on this house that you just purchased?

"A. Not against the mortgage, no.

"Q. Okay. Well, for what purpose do you receive money?

"A. I receive from Mrs. Leib $300 a month. It is based on all that she can afford.

". . . . . . . . . . . . . . . . .

"Q. And what was that conversation?

"A. At that time, the conversation was that her particular consideration would be $400 against the total expenses. But she couldn't make the grade. So I says all right. Fine.

". . . . . . . . . . . . . . . . .

"Q. Would you tell us what your annual income is, Mr. Elbaum?

"A. My annual income is $30,000 a year.

"Q. According to your figures, your monthly expenses amount to $2,000. Is that about right?

"A. I would say they come pretty close.

"Q. So that would be $24,000 a year and you subtract the contribution Mrs. Leib makes to you of $300 a month, $3,600. You come out with about $20,000 that you have to pay. Is that about right?

"A. If you don't take my partner, Uncle Sam.

"Q. So before taxes—

"A. That's right. I would say it would be close."

### APPLICATION OF CIVIL CODE SECTION 4801.5

■ It is clear that for approximately two and one-half years since the entry of the dissolution judgment June has been continuously living with Leonard and provides to him the identical services a nonworking wife is expected to and generally does furnish to a working husband. The services of a woman or a man, cohabiting or living on a platonic basis with a person of the opposite sex profitably employed, who renders services as homemaker, housekeeper, cook and companion have money value.

In *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106], after analyzing and dissecting the contrary arguments theretofore applied to services rendered during *meretricious* relationships, the court said at p. 683: "There is no more reason to presume that services are contributed as a gift than to presume that funds are contributed as a gift; in any event the better approach is to presume, as Justice Peters suggested, 'that the parties intend to deal fairly with each other.' (*Keene* v. *Keene, supra,* 57 Cal.2d 657, 674 [21 Cal.Rptr. 593, 371 P.2d 329] (dissenting opn.); see *Bruch, op. cit., supra,* [*Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services* (1976)] 10 Family L.Q. 101, 113.)"

Today's minimum wage approaches $3 per hour. Numerous men and women of all ages can and do earn an independent living for themselves and frequently assist others dependent upon them by living in, operating and maintaining households for others. Wholly aside from the fact that June's services as homemaker, housekeeper, cook and companion are not denied, it is clear from the record that such services were rendered and were satisfactory to Leonard. Leonard and June lived and cohabited together in three separate residences before settling in the house purchased by Leonard in which they now reside (or did at the time of trial). Nothing in June's declaration in response to the order to show cause which generated this appeal and nothing in the record lists any item of expense for maid, cleaning, or any other service required for the operation and maintenance of any of the residences occupied by her and Leonard.

In addition, the direct evidence given by June and Leonard is illusive and insubstantial. It is difficult to accept June's testimony that she paid $300 of the monthly rental of $400 for an apartment previously occupied by Leonard, herself and her son Paul because she and Paul were two and Leonard one, or Leonard's testimony that June paid him $300 per month because that was "all she could afford" or her statement that she did not know how much she received in the dissolution settlement made approximately two years before the hearing. This is especially so when it is borne in mind that she had just completed making a declaration in response to the order to show cause and testified with respect to items of stocks and two savings and loan accounts totaling $55,000.

Further, it is clear that if interest were collected at current rates on the savings account which "couldn't be touched" and was added to the other savings account of $18,000, June would receive at savings and loan rates

an approximate $300 monthly—an amount equivalent to the sum she pays to Leonard for rent.

In addition, June's declaration in response to the order to show cause showed dividends and interest at $109 per month. The large items of her listed expenses were $300 rent and $325 for food, $115 for auto repairs. Other miscellaneous items total $400. June testified she had the use of a Ferrari with all costs paid except gas. The item of $115 per month for auto repairs appears to be an amount with which she is not chargeable. If the $115 is subtracted, the remaining total, accepting all expenditures as listed, leaves a total of $1025.

On sheer mathematics, the difference between June's expenditures as testified to and what can clearly be her fixed monthly income from the dissolution judgment without spousal support of approximately $659 is a difference of less than $500 from her total listed expenditures.

On any market, the services of a homemaker, housekeeper, cook and companion who has demonstrated competence to the recipient of such services continuously for two and one-half years have a reasonable market value in excess of the use of a Ferrari and a trip to Europe.

In brief, June has the undoubted right to gift her services, which have substantial value on the open market, to Leonard—but we are satisfied she has no right to ask a court to collect for her from her former husband spousal support in a sum sufficient to enable her to make the gift.

▮ Unmarried persons of the opposite sex have the pronounced right to contract expressly or implicitly the terms upon which they will live and cohabit. (*Marvin, supra,* 18 Cal.3d at p. 684.) ▮ The conduct of the parties appears to prove a contract that: each would pay their own way and (except for the cost of dinners out, an occasional trip and the use of a Ferrari), Leonard would retain his independent assets and all his income produced as a result of his competence and efforts but that June, to maintain the relationship between the two, would contribute the earnings she could realize from independent employment as a homemaker, housekeeper, cook and companion and so much as might be necessary or which she could "afford" from spousal support plus as much of the income or capital from her independent assets which were awarded to her by the dissolution judgment.

For the purposes of this decision we assume that such a contract is within the ambit of the pronouncement of *Marvin* and therefore acceptable. ■ We hold, however, that a person, male or female, receiving spousal support who cohabits with a person of the opposite sex, cannot give away his or her services where the result is to create a status of apparent continuing need and thus overcome the presumption created by section 4801.5.

■ Expressly or implicitly, June and Leonard made a contract to live together on the terms to which they have each testified. Presumably, it can be changed by mutual consent. We are cited to no principle of law, common sense or abstract justice, which requires a court to compel Arnold to make up by way of spousal support he had theretofore as part of a dissolution judgment been ordered to pay to June the money value of services which June, under the terms of the contract, gives to Leonard.

Such a contract must be fair and reasonable with respect to the rights of a supporting spouse. Exchange of services, certainly in the context of cohabitation, contemplates a fair exchange with full regard to the fair and reasonable value of all services.

A court, for the purpose of determining June's further need for spousal support, is required to examine into the relationship of the cohabiting parties and to consider "changed circumstances" of the supported spouse.

In this connection, the manner in which June lives with Leonard, her services to Leonard, and Leonard's income and June's obvious right to share therein, if only on the basis of a domestic, are before the court.

■ Logical analysis would indicate that the Legislature created the presumption against a cohabiting former spouse supported by a divorced husband or wife based on thinking that cohabitation establishes a status for the benefit of the supported spouse and such status therefore creates a change of circumstances so tied in with the payment of spousal support as to be significant enough by itself to require a re-examination of whether such need for support continues in such a way that it still should be charged to the prior spouse.[9]

[9]Our Supreme Court in *Marvin* has recognized what is universal knowledge in the western world that marriage need not exist as a permanent status and that persons of the opposite sex may live together without marriage in a manner which creates obligations from one to the other. It is completely unrealistic, therefore, to assume, and the law never has so assumed, that obligations created by a dissolution of marriage need be of indefinite duration. California leads the way in legal and societal thinking and action toward the

■ In our above analysis we have made no attempt to place a money value upon the services of June as a sex companion. We suggest, however, the rewrite of section 4801.5 which recognizes cohabitation between divorced persons and others of the opposite sex as a socially acceptable fact of life indicates that the Legislature does not respect the legal fiction that sex except in a marriage has no value as legal consideration.

We are satisfied the evidence is insufficient in all respects to overcome the presumption of decreased need. On the contrary, substantial evidence shows by a heavy preponderance that June has not from the beginning of her relationship with Leonard had, and does not now have, a continuing need for spousal support.

Accordingly, we vacate the judgment and remand the case to the trial court to make a finding that the presumption in section 4801.5 has not been overcome and to enter an order in favor of Arnold, modifying June's right to spousal support to ten ($10) dollars per month. Costs on appeal to appellant.

Compton, J., and Beach, J., concurred.

---

achievement of the goal of complete equality between the sexes. Inherent in that objective and as a *sine qua non* to its attainment is the assumption of obvious responsibilities by a woman as well as a man. Section 4801.5 is a constructive legislative step in that direction. Controversies engendered by the marital relationship are now treated on the basis of "no fault." Spousal support is no longer a penalty (fn. 4) and the inherent tenuous nature of continuing obligations fixed in a dissolution judgment is significantly pinpointed in at least one vital respect, to wit: cohabitation, by section 4801.5. Our understanding of the legislative thinking codified in sections 4801 and 4801.5 which should be read together, is that requirements of a divorced spouse receiving spousal support while cohabiting with another person of the opposite sex should by reason of such "changed circumstances," be reassessed, and the reassessment should reflect and take into account all factors and facets which, based on evidence before a trial court, may be properly associated with a supported spouse and a cohabiting partner.